# FIFTH DIVISION
## RICKMAN, C. J.,
## MCFADDEN, P. J., and SENIOR APPELLATE JUDGE PHIPPS

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**September 27, 2021**

# In the Court of Appeals of Georgia

A21A0989. ALR OGLETHORPE, LLC et al. v. FIDELITY NATIONAL TITLE INSURANCE COMPANY.

MCFADDEN, Presiding Judge.

This case arises out of the failure of a mixed-use real estate development project, the Savannah River Landing. That failure followed the discovery of an overlooked beneficiary of a recorded easement, which brought the project to a halt. Following that failure, multiple suits against various parties were filed, transferred, dismissed, and reinstated. Some of the suits overlapped, with claims against some defendants proceeding in two courts simultaneously. Today's decision is our fifth appellate decision and third published opinion arising out of that litigation. See *ALR Oglethorpe, LLC v. Fidelity Nat. Title Ins. Co.*, 352 Ga. App. 363 (834 SE2d 866) (2019); *ALR Oglethorpe v. Henderson*, 346 Ga. App. XXII (June 2, 2018)

(unpublished); *ALR Oglethorpe, LLC et al. v. Henderson et al.*, Case No. A18A0158 (June 20, 2018) (unpublished; Rule 36); *ALR Oglethorpe, LLC et al. v. Peeples et al.*, Case No. A15A1358 (Nov. 20, 2015) (unpublished; Rule 36); *ALR Oglethorpe, LLC v. Henderson*, 336 Ga. App. 739 (783 SE2d 187) (2016) (physical precedent only).

Before us today is a grant of summary judgment to Fidelity National Title Insurance Company. Fidelity had been hired by the closing attorneys, the law firm Coleman Talley, LLP, to prepare a title commitment for the properties. Fidelity, in turn, hired attorney R. E. Hodges to prepare a title abstract. Attorney Hodges then hired C. Gerald Henderson to do the title research. Henderson identified the easement, but overlooked one of the easement's beneficiaries.

The developer, ALR Oglethorpe, LLC, and five individual investors, who had lent money to ALR's holding company (together, "the plaintiffs"), appeal from the grant of summary judgment to Fidelity. They assert claims for contribution and indemnity, which had been assigned to them by the closing attorneys.

We hold that, because a release and settlement agreement between ALR and Fidelity contains a covenant not to sue, it bars ALR from asserting these claims against Fidelity. We hold also that, because the investors have not shown that Fidelity breached a duty directly to them, they cannot show that it was a joint tortfeasor as to

2

them. So they may not pursue their assigned claim for contribution. Finally, we hold that the investors have not asserted a sustainable claim for indemnity—again because they cannot show that Fidelity was a joint tortfeasor as to them and, more fundamentally, because they claim a form of indemnity that is no longer viable under the apportionment statute, OCGA § 51-12-33. So we affirm the grant of Fidelity's motion for summary judgment.

1. *Factual background*.

We review the grant or denial of a motion for summary judgment de novo, and "we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant." *Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010) (citation and punctuation omitted).

So viewed, the evidence shows that ALR purchased parcels of property in Savannah with the intention of creating a mixed-use development. ALR retained the law firm Coleman Talley to assist with the project. As stated in *ALR Oglethorpe v. Henderson*, 336 Ga. App. at 739,

> Coleman Talley asked [appellee] Fidelity National Insurance Company
> to prepare a title commitment for the properties, and Fidelity hired an
> attorney, R. E. Hodges, to prepare a title abstract. Hodges then hired [C.
> Gerald] Henderson, whose abstract revealed the existence of an access

3

easement across one of the tracts but failed to identify all of the parties benefitted by the easement across the tract.

Fidelity listed the access easement on a schedule of exceptions included with the title commitment, and Coleman Talley drafted an agreement to terminate the easement[ ] signed only by the benefitted parties who were identified in the title abstract. Fidelity then removed the exception to the title commitment. . . .

Id.

The sale closed on May 15, 2006. More than a year later, in September or October 2007, the investors lent $4.2 million to ALR's holding company, non-party Oglethorpe Landings Holdings, LLC. Then, in December 2007, 18 months after the closing, Cement Consumers Association, LLC notified ALR that it was a beneficiary of the easement. Although the title abstract had disclosed the easement and some beneficiaries, it had not disclosed this beneficiary and the termination-of-easement document drafted by Coleman Talley did not terminate Cement Consumers Association's easement rights.

ALR made a claim under the title policy. Fidelity resolved the claim by purchasing various properties in a series of transactions in order to give Cement Consumers Association alternate access in exchange for it releasing its easement

4

rights. Fidelity and ALR entered into an agreement entitled "Release, Settlement Agreement and Covenant Not to Sue."

Multiple lawsuits ensued. Eventually, the plaintiffs settled with Coleman Talley, and Coleman Talley assigned to the plaintiffs any rights it might have against Fidelity and others for contribution or indemnity. The plaintiffs filed two lawsuits based on the assignment: they filed a lawsuit against Hodges and Henderson, and they filed this lawsuit against Fidelity and the sellers.

The trial court granted Hodges's and Henderson's motions for summary judgment, and we affirmed without opinion. *ALR Oglethorpe v. Henderson*, 346 Ga. App. XXII (June 2, 2018) (unpublished).

In the instant lawsuit, the plaintiffs sued Fidelity and the sellers. The trial court granted the sellers' motion to dismiss the complaint against them and Fidelity's motion for summary judgment. The plaintiffs filed this appeal of the grant of Fidelity's motion for summary judgment.

2. *Release, Settlement Agreement and Covenant Not to Sue*.

The plaintiffs contend that the trial court erred by holding that the Release, Settlement Agreement and Covenant Not to Sue bars ALR's claims against Fidelity.

They argue that ALR is asserting Coleman Talley's claims, not its own. And they argue that the agreement was not supported by consideration. We disagree.

Fidelity and ALR entered that settlement agreement when Fidelity resolved ALR's claim under the title insurance policy. The agreement was broadly written. It provided that the parties "wish[ed] to resolve any and all claims by [ALR] against [Fidelity] under the [p]olicies relating in any way to the [e]asement" and that they

> intended to forever resolve the [p]olicy [c]laims and any claims or other matters between [ALR] on the one hand and [Fidelity], on the other hand, arising out of or in connection with the [p]olicy [c]laims, including, but not limited to, any claims or matters arising out of the [e]asement (the "[r]eleased [c]laims") without terminating the policies.

To that end, ALR agreed to release Fidelity

> from any and all liability for any and all claims, demands, damages, penalties, attorney fees, costs, loss of services, loss of income, expenses, compensation, commissions, reimbursements, equitable relief and/or rights and causes of action of whatsoever kind and nature, resulting from or in any way arising or growing out of, and by reason of, any and all known and unknown, fixed or contingent, in law or in equity, in tort or in contract, at common law or statute, compensatory or punitive, foreseen and unforeseen claims, and the consequences thereof which [i]nsured [p]arties now have or may hereafter have against [Fidelity],

6

arising out of or relating in any way to the [r]eleased [c]laims, from the beginning of time to the time of the execution of this [a]greement.

ALR agreed in the covenant-not-to-sue paragraph of the agreement that it "expressly covenant[ed] never to institute or participate as a [p]arty in any suit or action, at law or in equity, against any other [p]arty, its or their successors or assigns, by reason of the [r]eleased [c]laims."

(a) *The settlement agreement between Fidelity and ALR encompasses all of ALR's claims against Fidelity, including those assigned to ALR under its settlement agreement with Coleman Talley.*

The plaintiffs argue that the agreement does not defeat Coleman Talley's right to seek contribution and indemnity from Fidelity, a right that the law firm assigned to ALR, so ALR may pursue this action in spite of the agreement. We hold that the broad language of the agreement shows the intent to encompass the claims assigned to ALR.

The plaintiffs' argument depends on construction of the agreement, which we review de novo. *Unified Govt. of Athens-Clarke County v. Stiles Apts*., 295 Ga. 829, 832 (1) (764 SE2d 403) (2014).

A release or settlement agreement is a contract subject to construction by the court. It is governed by state law applicable to contracts in general. The cardinal rule of construction is to determine the intention of the parties. Where the terms of a written contract are clear and unambiguous, the court will look to the contract alone to find the intention of the parties. Such a contract is the only evidence of what the parties intended and understood by it.

*UniFund Financial Corp. v. Donaghue*, 288 Ga. App. 81, 82 (653 SE2d 513) (2007) (citations and punctuation omitted). See also OCGA § 13-2-3 ("The cardinal rule of construction is to ascertain the intention of the parties. If that intention is clear and it contravenes no rule of law and sufficient words are used to arrive at the intention, it shall be enforced irrespective of all technical or arbitrary rules of construction."). A covenant not to sue is a contract that "bars the holder of the cause of action[, here, ALR,] from asserting it against the party or parties with whom he has covenanted[, here, Fidelity]." *Brantley Co. v. Briscoe*, 246 Ga. 310, 312 (1) (271 SE2d 356) (1980). "In order to ascertain what claims the parties sought to address in the [covenant not to sue], we must read that provision in light of the contract as a whole and in the legal context in which it was created." *Langley v. MP Spring Lake*, 307 Ga. 321, 325 (834 SE2d 800) (2019).

Here, ALR expressly released Fidelity "from any and all liability for any and all claims . . . arising out of or relating in any way to the released claims. . . ." The agreement defined "released claims" as "any claims or other matters . . . arising out of or in connection with the [p]olicy [c]laims," which it defined as "any claims or matters arising out of the [e]asement. . . ." ALR expressly agreed that it would not participate in or institute "any suit or action, at law or in equity" against Fidelity in order to effectuate the parties' "wish to resolve any and all claims by [ALR] against [Fidelity] . . . relating in any way to the [e]asement." ALR further agreed "never to institute or participate as a [p]arty in any suit or action against [Fidelity] by reason of the [r]eleased [c]laims."

This broad language establishes a clear intent to resolve any claim ALR might ever have against Fidelity relating to the non-terminated easement rights. When the agreement is read as a whole in the legal context of that intent, *Langley*, 307 Ga. at 325, the claims the parties sought to address in the agreement and which ALR agreed not to pursue are clear: any and all claims relating to the easement. Regardless of Coleman Talley's right to seek contribution or indemnity from Fidelity, the contractual language "is a clear expression of intent and must be recognized to mean what it says." *Brantley Co.*, 246 Ga. at 312 (1). In light of this intent, we conclude

that the agreement encompasses ALR's claims in this lawsuit, even though the claims arise from an assignment from Coleman Talley.

(b) *Consideration*.

The plaintiffs also argue that the agreement was not supported by consideration because Fidelity had a preexisting contractual obligation to pay under the title policy. We hold that the compromise of disputed claims, as recited in the agreement, is sufficient consideration.

We review the plaintiffs' argument keeping in mind that "[s]light consideration is sufficient to sustain a contract," *Franklin v. UAP/Ga. Ag. Chem.,* 237 Ga. App. 71, 74 (514 SE2d 241) (1999), and that, where there is consideration to support the contract, "courts do not inquire into the adequacy of contract consideration[.]" *Shuman v. ILA Local 1414*, 277 Ga. App. 76, 78 (4) (625 SE2d 482) (2005).

The Release, Settlement Agreement and Covenant Not to Sue listed as consideration the termination of Cement Consumer Association's easement rights as well as "the mutual agreements," "mutual promises and obligations . . . and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged." ALR agreed that it had "independently arrived at the conclusion that the consideration for [the a]greement is fair and appropriate." Additionally, the

agreement provided that it "affect[ed] the settlement of claims which are denied and contested, and nothing in this [a]greement shall constitute or be construed as an admission of liability or wrongdoing by any [p]arty."

The plaintiffs correctly argue that "[w]here a party receives no more than the amount legally owed and where at that time there is no dispute existing between the parties, then the absence of any additional consideration (such as settlement of a disputed account), causes the purported release to fail, it being a nudum pactum." *Jones v. Admiral Ins. Co.*, 195 Ga. App. 765 (395 SE2d 234) (1990) (citation and punctuation omitted). But here, Fidelity's "evidence showed that the claim was not undisputed or liquidated." Id. For one thing, the agreement itself says that the claim is disputed. ALR points to no evidence contesting this point. And there was no liquidated sum that Fidelity was required to pay under the policy. Rather, Fidelity entered a series of transactions to purchase various properties to give Cement Consumers Association alternate access in exchange for its rights under the easement.

"[T]he compromise of disputed claims, as recited in a settlement agreement, is valuable consideration in the eyes of the law." *Byers v. McGuire Properties*, 285 Ga. 530, 535-536 (2) (679 SE2d 1) (2009), overruled on other grounds by *SRM Group v. Travelers Property Cas. Co. of America*, 308 Ga. 404 (841 SE2d 729) (2020). Accord

11

*LNV Corp. v. Studle*, 322 Ga. App. 19, 24 (2) (b) (743 SE2d 578) (2013) (compromise of disputed claims provided consideration for settlement agreement). See also *Jones*, 195 Ga. App. 765 (rejecting insured's argument that insurer's payment of policy limits in exchange for release was an undisputed amount due for the basic benefits under the policy so that there was no consideration to support the release); 3 Williston on Contracts § 7:34 (4th ed.) ("any sum given and accepted as consideration for an agreement to discharge a claim which is unliquidated or the subject of a bona fide and reasonable dispute is sufficient consideration").

The trial court did not err in holding that consideration supported the agreement and properly granted Fidelity summary judgment on ALR's claims. But we agree with ALR and the investors that the agreement does not apply to the investors and so we continue our analysis as to those plaintiffs.

We address whether the trial court correctly granted Fidelity's motion for summary judgment on the claims Coleman Talley assigned to them. Both of those claims—contribution and indemnity—are based on the liability of one joint tortfeasor to another joint tortfeasor.

3. *Contribution*.

The investors argue that Fidelity is a joint tortfeasor with Coleman Talley, so it can be held liable for contribution and they may pursue the contribution claim assigned to them by the law firm. But the right to contribution is statutory, and the statute makes it available only among joint tortfeasors. OCGA § 51-12-32. We hold that Fidelity is not a joint tortfeasor with Coleman Talley, at least with regard to the investors, so the investors' assigned claim for contribution fails.

We note at the outset that we must pretermit whether the apportionment statute, OCGA § 51-12-33, impacts the contribution claim before us. The statutory right of contribution under OCGA § 51-12-32 is now subject to certain limitations imposed by the apportionment statute, see OCGA § 51-12-32 (a) (establishing right of contribution "[e]xcept as provided in Code Section 51-12-33"). But the apportionment statute has not completely abolished the statutory right of contribution. "Where apportionment does not apply, joint tortfeasors who both proximately cause a single injury are jointly and severally liable for damages caused by the injury, and a tortfeasor may seek contribution from its joint tortfeasor(s)." *Alston & Bird v. Hatcher Mgmt. Holdings*, __ Ga. __, __ (2) n. 2 (__ SE2d __) (Case No. S20G1419, decided Aug. 10, 2021). And the parties have not argued, below or on appeal, that apportionment applies in this case to limit the right of contribution at issue here. And

13

the trial court did not rule on that issue. An "argument . . . not raised below or ruled on by the trial court . . . is not properly before us on review." *Johnson St. Properties v. Clure*, 302 Ga. 51, 56 (1) (a) (ii) n. 1 (805 SE2d 60) (2017). So we do not address the impact of the apportionment statute upon the investors' statutory right of contribution.

Turning back to the contribution statute, OCGA § 51-12-32, it expressly provides that "the right to contribution relates only to joint tortfeasors, and where the proposed defendant cannot be made liable as a joint tortfeasor, the contribution action does not state a claim." *Hines v. Holland*, 334 Ga. App. 292, 295 (1) (a) (779 SE2d 63) (2015) (citations, punctuation, and emphasis omitted). So in order to defeat Fidelity's motion for summary judgment on the contribution claim, the investors had to present evidence creating a dispute on the issue of whether Fidelity and Coleman Talley were joint tortfeasors. In order to make that showing, the investors had to present evidence that Fidelity, like the law firm, can be held directly liable to them. Cf. *Weller v. Brown*, 266 Ga. 130-131 (464 SE2d 805) (1996) (considering claim for equitable contribution under OCGA § 23-2-71). So to determine if the question whether Fidelity can be held directly liable to the investors turns on disputed facts, we look at the basis of the investors' claims.

14

In their complaint, the investors alleged that Coleman Talley had assigned to them all causes of action that Coleman Talley had against Fidelity and the other defendants; that Fidelity had breached its duty to Coleman Talley by failing to discover a beneficiary of the easement; that Coleman Talley's liability arose from the tortious conduct of Fidelity; and that as Coleman Talley's assignees, they were entitled to recover damages under theories of indemnity and contribution. These allegations do not state a claim for Fidelity's direct liability to the investors.

Turning to the investors' appellate brief, they argue that Fidelity's liability to them arises: "from faulty information regarding the status of the title, as well as Fidelity's own negligence in approving the termination [of easement] document"; from Fidelity's "fail[ure] to provide accurate title information"; from Fidelity's "negligently provid[ing] title examination services, and (by an attorney working with the company) negligently approv[ing] the [t]ermination of [e]asement document"; from Fidelity "assum[ing] the duty to assist in the termination of the easement"; and from "negligent misrepresentation" by failing to discover and disclose that Cement Consumers Association was a beneficiary of the easement. These allegations assert claims for negligent misrepresentation and legal malpractice, but they do not state a basis for Fidelity's direct liability to the investors.

15

The investors' claims stemming from Fidelity's failure to identify Cement Consumers Association as a beneficiary of the easement when communicating with Coleman Talley sound in negligent misrepresentation. (As noted above, those are: giving faulty information regarding the status of the title; failing to provide accurate title information; and negligently providing title examination services.) And as they implicitly recognize in their appellate brief, their claim stemming from a Fidelity attorney's approval of Coleman Talley's proposed termination-of-easement document sounds in legal malpractice.

So the claims the investors assert as the basis of Fidelity's joint-tortfeasor liability—to support their right to pursue the assigned claim for contribution—are claims for negligent misrepresentation and legal malpractice. And as detailed below, the plaintiffs have not presented evidence creating a dispute on the issue of whether Fidelity can be held liable to the investors for negligent misrepresentation and legal malpractice.

(a) *Negligent misrepresentation.*

The essential elements of a cause of action for negligent misrepresentation against one with whom the plaintiff is not in privity are: "(1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2)

16

such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance." *Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas*, 267 Ga. 424, 426 (1) (479 SE2d 727) (1997).

The investors have not created a jury question as to their negligent misrepresentation claim against Fidelity because, among other reasons, they have not pointed to any evidence that they relied on *any* information supplied by Fidelity, much less false information. The investors argue that their reliance on Fidelity's "title work" is "evidenced by the fact that [they] authorized closing on the [p]roperty." But in their appellate brief, they have not pointed to any evidence that they authorized the closing on the property. Indeed, they have not pointed to any evidence that they were involved in the project at all until they lent money to ALR's holding company 16 or 17 months after the closing.

The trial court did not err in granting summary judgment to Fidelity on the investors' assigned claim for contribution sounding in negligent misrepresentation.

(b) *Legal malpractice*.

As for the claim for legal malpractice, the investors point to no evidence that they had an attorney-client relationship with Fidelity or its attorney. Indeed, in the trial court the plaintiffs conceded they had no attorney-client relationship with

17

Fidelity. "No attorney-client relationship has been demonstrated, and thus [the investors] have no claim against [Fidelity (or its attorney)] for legal malpractice." *Williams v. Fortson, Bentley & Griffin*, 212 Ga. App. 222, 224 (1) (b) (441 SE2d 686) (1994).

The trial court did not err in granting summary judgment to Fidelity on the investors' assigned claim for contribution sounding in legal malpractice.

(c) *Causation*.

Given our holdings in Division 3 (a) and (b), we do not reach the investors' enumeration that the trial court erred in holding that Coleman Talley's negligence was the sole proximate cause of any harm.

4. *Indemnity.*

The investors's indemnity claim fails for two reasons. Their indemnity claim rests on the proposition that Fidelity is a joint tortfeasor as to them—a proposition which, as detailed above, is unsustainable. And, more fundamentally, they claim a form of indemnity that is no longer viable under the apportionment statute, OCGA § 51-12-33.

The investors argue that they may pursue the assigned claim of common-law indemnity under OCGA § 51-12-32 (c), which provides that "the right of indemnity,

18

express or implied, from another or others shall continue unabated and shall not be lost or prejudiced by compromise and settlement of a claim or claims for injury to person or property or for wrongful death and release therefrom." But they do not allege a right to indemnity under contract or under vicarious liability, the only forms of indemnity that remain viable after the enactment of the apportionment statute, so they are not entitled to pursue a claim for indemnity.

The apportionment statute, OCGA § 51-12-33, has not only changed the law of contribution, as noted in Division 3, supra, but also has changed the law of indemnity, as described in more detail below. Following its enactment, "Georgia law continues to recognize two broad categories of indemnity: as created by contract, as between a surety and a debtor; and under the common law of vicarious liability, as between principals and agents." *Dist. Owners Assn. v. AMEC Environmental & Infrastructure*, 322 Ga. App. 713, 715 (1) (747 SE2d 10) (2013) (citations and punctuation omitted); accord *Hines*, 334 Ga. App. at 296 (1) (b). The investors do not argue that Coleman Talley is entitled to indemnification from Fidelity by virtue of a contract. Nor do they argue a right to indemnity based on vicarious liability.

Instead, in their brief, the investors rely on cases administering the former rule that passive tortfeasors have a right to indemnity against active tortfeasors and argue

19

that Coleman Talley's negligence was passive, while Fidelity's negligence was active. See, e.g., *Colt Indus. Operating Corp. v. Coleman*, 246 Ga. 559, 560 (272 SE2d 251) (1980) ("Under Georgia law, if the negligence of the tortfeasor is passive as opposed to active, a tortfeasor can seek indemnity against a party whose conduct is alleged to be the proximate cause of the injury."); *Jova/Daniels/Busby v. B&W Mechanical Contractors*, 167 Ga. App. 551, 553 (307 SE2d 97) (1983) (same). So, the investors argue, Coleman Talley, the passive tortfeasor, has a right of indemnity against Fidelity, the active tortfeasor, and they may pursue this right assigned to them by Coleman Talley. This theory of indemnity concerns liability among joint tortfeasors. See *Reid v. Morris*, 309 Ga. 230, 238 (845 SE2d 590) (2020) (noting that in 1997, Georgia law "distinguished between active and passive tort-feasors in the context of contribution and indemnity among joint tort-feasors"). But, as we held in Division 3, Fidelity is not a joint tortfeasor as to the investors.

More fundamentally, even if Fidelity were a joint tortfeasor, following the enactment of the apportionment statute, common-law indemnity based on the distinction between active and passive negligence no longer exists in Georgia.

The enactment of the apportionment statute, OCGA § 51-12-33, changed the Georgia law of joint tortfeasor liability (whether in the context of claims for

20

contribution or in the context of claims for indemnity) by limiting joint and several liability of tortfeasors to instances when fault is legally or factually indivisible. See *Alston & Bird v. Hatcher Mgmt. Holdings*, __ Ga. at __ (3); *Fed. Deposit Ins. Corp. v. Loudermilk*, 305 Ga. 558, 569 (2) (826 SE2d 116) (2019) (The apportionment statute did not abrogate "Georgia's common-law rule imposing joint and several liability on tortfeasors who act in concert . . . but only insofar as [such concerted action] was traditionally understood at common law within the context of torts."). See generally *Loose v. Offshore Navigation*, 670 F2d 493, 500-502 (III) (5th Cir. 1982) ("the concepts of active and passive negligence have no place in a liability system that considers the facts of each case and assesses and apportions damages among joint tortfeasors according to the degree of responsibility of each party."); *Ga. Power Co. v. Sure Flow Equip.*, Case No. 1:13-CV-1375-AT, 2014 U.S. Dist. LEXIS 141911, at *10 (II) (B) (N.D. Ga. July 22, 2014) (after the enactment of the apportionment statute, "tortfeasors have no need for a common[-]law claim for indemnification against joint tortfeasors because their own liability already takes into account a reduction for the liability of others").

In light of this changed legal landscape, we held in *Dist. Owners Assn.*, 322 Ga. App. at 713, that after the enactment of the apportionment statute, a defendant may

not seek indemnification from another defendant as a joint tortfeasor simply based on allegations that the other defendant's negligence actually caused the harm. Id. at 716 (1). In that case, a plaintiff sued a premises owner for the injuries that he sustained on its property when he jumped off a wall that concealed a 33-foot drop between the sidewalk and a parking deck. Id. at 713-714. The premises owner filed a third-party complaint against the designers and builders of the wall and parking deck, claiming that they were liable to the premises owner under theories of common-law indemnification and common-law apportionment. Id. at 714.

We affirmed the grant of the third-party defendants' motion to dismiss. We held, as noted previously, that after the enactment of the apportionment statute, Georgia law recognizes "two broad categories of indemnity: as created by contract, as between a surety and a debtor; and under the common law of vicarious liability, as between principals and agents." *Dist. Owners Assn.*, 322 Ga. App. at 715 (1) (citations and punctuation omitted). See also *Jones v. GMAX*, No. 1:15-CV-0083-WBH, 2017 U.S. Dist. LEXIS 225733, at *5-6 (N.D. Ga. June 2, 2017) (rejecting a claim of common-law indemnity based on the distinction between active and passive negligence and holding that "Georgia law continues to recognize only two categories of indemnity: as created by contract, as between a surety and a

22

debtor; and under the common law of vicarious liability, as between principals and agents.") (citation and punctuation omitted).

The premises owner in *Dist. Owners* alleged that if it were found to be liable to the plaintiff, it was entitled to indemnity from the third-party defendants because any deficiencies in the wall and parking deck were the result of their negligent design and construction. *Dist. Owners*, 322 Ga. App. at 716 (1). We held that because the third-party complaint did not allege indemnity based on contract or vicarious liability but instead sought payment from the third-party defendants as joint tortfeasors, common-law principles of indemnity did not apply. Id.

Likewise, here the investors do not allege indemnity based on contract or indemnity based on vicarious liability. Rather, they allege that Coleman Talley has a claim for indemnity because the problems with terminating the easement were the result of Fidelity's negligence in failing to find all of the beneficiaries and in approving the termination document. "Because no allegations of . . . vicarious liability have been made in this case, common[-]law indemnity principles do not apply [and] the trial court did not err in [granting summary judgment to Fidelity on the] common-law indemnity claim." *Dist. Owners*, 322 Ga. App. at 716 (1) (citation and punctuation omitted).

5. *Attorney fees*.

The plaintiffs argue that should any portion of the trial court's decision be reversed, then they should be allowed to pursue their claim for attorney fees. Because we affirm the trial court's grant of summary judgment to Fidelity, this argument presents nothing for review.

*Judgment affirmed. Rickman, C. J., and Senior Appellate Judge Herbert E. Phipps concur*.