**FIRST DIVISION
BARNES, P. J.,
BROWN and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**November 1, 2022**

# In the Court of Appeals of Georgia

A22A0899. FARID et al. v. GASKELL et al.

HODGES, Judge.

Mohammad Farid sued tractor trailer driver Beau Anthony Gaskell and a variety of other entities, including EMBA Transportation, Inc. (Gaskell's employer) and Knight Specialty Insurance Company (EMBA's insurer),[1] after Gaskell's tractor trailer caused a motor vehicle collision in which Farid and his two minor children were injured. Farid also served a copy of his complaint on Mid-Century Insurance Company ("Mid-Century"), his uninsured/underinsured motorist ("UM") insurance carrier. Farid eventually settled his claims against Gaskell, EMBA, and Knight for a total of $450,000, and Mid-Century moved for summary judgment, arguing that Farid

---

[1] See OCGA §§ 40-1-112 (c) (authorizing joinder of motor carrier and insurance carrier to cause of action against motor carrier) and 40-2-140 (d) (4) (same), collectively known as the "direct action statutes."

failed to satisfy the conditions of OCGA § 33-24-41.1 to exhaust Knight's available $1,000,000 primary insurance coverage before proceeding against a UM carrier. The Superior Court of Rockdale County agreed and granted Mid-Century's motion, and Farid appeals. Finding no error, we affirm.

Under Georgia law,

> [s]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Where a defendant moving for summary judgment discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue. . . . In our de novo review of the grant . . . of a motion for summary judgment, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant.

(Citations and punctuation omitted.) *Barko Response Team, Inc. v. Sudduth*, 339 Ga. App. 897, 898 (795 SE2d 198) (2016). So viewed,[2] the record reveals that Farid and his two minor children were traveling southbound on Interstate 75 in Cobb County on September 10, 2018, when a tractor trailer driven by Gaskell suddenly changed

---

[2] Notably, the record does not contain any evidence — affidavits, deposition transcripts, discovery responses, and the like — concerning the circumstances of the collision.

lanes and struck a 2015 Kia, which then struck Farid's vehicle, causing it to overturn. As a result, Farid and his passengers sustained injuries.

According to Farid's counsel's allegations,[3] Gaskell "quit and had been terminated" by prior to the collision. Farid's counsel claimed that Gaskell had been instructed to leave his truck "where it stood out on the road[,]" but that Gaskell did not trust the dispatcher not to report the truck abandoned and, instead, was driving the truck to his residence in Georgia. In addition, Farid's counsel alleged that the truck was not scheduled on EMBA's insurance policy with Knight. A declarations page in the record demonstrates that, on the date of the collision, EMBA maintained a motor carrier liability policy issued by Knight in the amount of $1,000,000 covering 67 vehicles, but neither EMBA's policy issued by Knight, nor a schedule of covered vehicles, is included in the record.

Farid sued Gaskell, EMBA, and Knight for damages. In an amended complaint that added Knight as a party defendant, Farid alleged that Knight issued a motor carrier liability insurance policy to EMBA covering Gaskell's truck. Thereafter, Farid

---

[3] The allegations are contained in an affidavit by Farid's counsel filed in response to Mid-Century's motion for summary judgment. As more fully described herein, attachments to the affidavit included emails from a third-party administrator and Knight's counsel concerning coverage as well as a reservation-of-rights letter issued to EMBA from the third-party administrator.

settled the case for $450,000 and executed a purported limited release; however, as noted, the policy limit in Knight's policy amount was $1,000,000. In a document entitled "Settlement Agreement and Release" (the "Agreement"), Farid stated that

[t]his Settlement Agreement and Release results from a compromise payment by [Knight] pursuant to its purported surety obligations under the federal motor carrier Form MCS-90.[4] The Undersigned agree and stipulate that this payment is made on a voluntary payment basis only. The Undersigned agree and stipulate that [Knight] has maintained that

---

[4] We have noted that

[a]n MCS-90 endorsement to an automotive insurance policy obligates an insurer to cover an insured's negligence involving "vehicles subject to the financial responsibility requirements of … the Motor Carrier Act." The Motor Carrier Act, in turn, creates minimum levels of financial responsibility "for the transportation of property by motor carrier within the United States." The purpose of a MCS-90 endorsement is to assure compliance with federal minimum levels of financial responsibility for motor carriers. The MCS-90 endorsement must be attached to any liability policy issued to for-hire motor carriers operating motor vehicles transporting property in interstate commerce. The endorsement creates a suretyship, which obligates an insurer to pay certain judgments against the insured arising from interstate commerce activities, even though the insurance contract would have otherwise excluded coverage.

(Citations and punctuation omitted.) *Grange Indem. Ins. Co. v. Burns*, 337 Ga. App. 532, 533-534 (788 SE2d 138) (2016).

4

it owes no insurance coverage over the Limited Releasees[5] as a result of the incident giving rise to this case. The Undersigned agree and stipulate that [Knight]'s voluntary payment provided as consideration for this Settlement Agreement and Release is offered only as a means to avoid litigation and the costs of pursuing a declaratory judgment action in which [Knight] would set forth the legal basis for its absence of coverage and/or any MCS-90 surety obligation. In exchange for the voluntary payment set forth herein, *the Undersigned agree and stipulate that [Knight] shall be fully released under its policy and under the Form MCS-90, and shall have no further obligation to the Undersigned under either Policy Number AFXIN000038-00 or the Form MCS-90. This Settlement Agreement and Release shall have the effect of a General Release as to [Knight] only.*

(Emphasis supplied.) The Agreement further stated that:

in consideration for the sum paid above, the Undersigned grant this Settlement Agreement and Release. The force and effect of this Settlement Agreement and Release shall be as intended by . . . OCGA § 33-24-41.1 with respect to [Gaskell] and [EMBA] only. This Settlement Agreement and Release shall operate as a release of [Gaskell] and [EMBA] except that this Settlement Agreement and Release shall not bar any claims the Undersigned have against [Gaskell] and [EMBA] to the extent that other insurance coverage is available which covers the claim or claims of the Undersigned against [Gaskell] and [EMBA].

---

[5] Gaskell and EMBA were identified as the "Limited Releasees."

In addition, the Agreement provided that "the Undersigned agree and stipulate that [Knight] shall be fully released under the Form MCS-90, and shall have no further obligation to the Undersigned under Policy Number AFXIN000038-00 or the Form MCS-90." Finally, the Agreement stated that

> [i]t is further understood and agreed that the payment of the consideration stated above is a compromise settlement of a disputed claim at an amount lower than the amount which might have been awarded by a court and jury. The purpose of said compromise and settlement is to avoid the uncertainties, expense and delay attendant upon a trial. It is stipulated that no sum is paid as punitive damages. It is further stipulated and agreed that the sums paid under this Settlement Agreement and Release do not fully and completely compensate the Undersigned for the economic and non-economic losses they have suffered.

Farid also notified his UM carrier, Mid-Century, of the claim, and Mid-Century filed a motion for summary judgment arguing that Farid had failed to exhaust Knight's available policy limits prior to seeking UM benefits. The trial court agreed and granted Mid-Century's motion. This appeal follows.

In a single enumeration of error focused on the alleged lack of insurance for Gaskell's tractor trailer, Farid contends that the trial court erred in granting summary judgment to Mid-Century because: (a) Knight's payment pursuant to the MCS-90

6

endorsement was a surety payment rather than a liability insurance payment; (b) the evidence demonstrated that the tractor trailer was wholly uninsured in that: (i) the truck was not scheduled on the company's liability policy; and (ii) the driver of the truck, Gaskell, had been fired at the time of the collision and was disobeying his former employer's instructions not to drive the truck; and (c) Knight's payment was a voluntary payment only since there was no coverage. We are not persuaded.

At the outset, each of Farid's arguments depends largely on Farid's counsel's affidavit concerning the purported circumstances underlying the Agreement. Attached to counsel's affidavit are emails from a third-party administrator and Knight's counsel suggesting that there was no coverage for the collision because Gaskell's truck was not a scheduled vehicle on EMBA's motor carrier policy with Knight and because EMBA was out of business. Farid's counsel also included a *second* reservation-of-rights letter issued to EMBA from the third-party administrator stating that Gaskell's truck was not scheduled on EMBA's policy; an earlier reservation-of-rights letter is not included in the record.[6] Furthermore, neither EMBA's policy with Knight nor any schedule of covered vehicles is included in the record.

---

[6] The May 7, 2019 reservation-of-rights letter that is included in the record states that it "follows the Reservation of Rights letter that was sent . . . on December 7, 2018[,]" which is not included in the record.

7

In short, then, the only support for Farid's position is a reservation-of-rights letter from a third-party administrator on Knight's behalf.[7] However, such a reservation-of-rights letter is not conclusive proof of a lack of coverage. See generally *American Safety Indemn. Co. v. Sto Corp.*, 342 Ga. App. 263, 267-268 (2) (802 SE2d 448) (2017) ("A reservation of rights is a term of art designed to allow an insurer to provide a defense *while still preserving the option to later litigate and ultimately deny coverage*[;]" "a reservation of rights is only available to an insurer who undertakes a defense *while questions remain about the validity of the coverage*") (citation and punctuation omitted; emphasis supplied). Moreover, we have not been asked to evaluate — nor could we, even had we been asked — the effect of the reservation-of-rights letter because this appeal does not arise from a declaratory judgment action or a motion to enforce the Agreement. See generally id. at 268 (2); see also *LNV Corp. v. Studle*, 322 Ga. App. 19, 21-22 (2) (743 SE2d 578) (2013) ("In considering the enforceability of an alleged settlement agreement, . . . a trial court is obviously limited to those terms upon which the parties themselves have mutually agreed.") (citation

---

[7] But see *LNV Corp. v. Studle*, 322 Ga. App. 19, 21 (1) (743 SE2d 578) (2013) (finding that, in review of settlement agreement, "parol negotiations preceding the making of a written contract are merged in the written contract, and parol evidence is inadmissible to vary or contradict the terms of a written contract which is valid on its face").

omitted). Therefore, even when viewed in a light most favorable to Farid, the central tenet of Farid's arguments on appeal is not supported by the record.

With that in mind, we will address each of Farid's arguments in turn.

(a) *MCS-90*. In a somewhat convoluted argument, Farid contends that Knight's settlement payment was made pursuant to its MCS-90 obligation under federal law, which is a surety obligation rather than a liability insurance obligation. As a result, according to Farid, Knight's settlement payment did not constitute a payment from any available insurance coverage or even trigger the application of Knight's policy, and Gaskell's truck therefore remained uninsured as that term is defined in OCGA § 33-7-11. We do not agree.

In response to Mid-Century's summary judgment motion, Farid argued, based on his counsel's affidavit concerning the circumstances of the settlement, that Knight's payment was made "to avoid litigation on the applicability of the MCS-90 endorsement" and that "[t]here was no failure to exhaust the liability limits because there were no liability limits as there was no coverage." The trial court concluded that "the issue of whether Knight . . . was liable under the policy itself or Form MCS-90, and the fact that the agreement was entered to avoid litigation over the applicability of its MCS-90 surety endorsement[,] is irrelevant" because the parties' settlement

9

agreement specifically provided that Knight "shall be fully released under its policy and under Form MCS-90. . . ."

"A settlement agreement is a contract subject to the usual rules of contract construction." (Citation omitted.) *Wood v. Wade*, 363 Ga. App. 139, 146 (2) (a) (869 SE2d 111) (2022).

> Construing the language of a contract presents a question of law for the court, unless the language presents an ambiguity that cannot be resolved by the rules of construction. The cardinal rule of construction is to ascertain the contracting parties' intent, and *where the terms of a written contract are clear and unambiguous, the court will look to the contract alone to find the intention of the parties*. To determine the intent of the parties, all the contract terms must be considered together in arriving at the construction of any part, and a construction upholding the contract in whole and every part is preferred.

(Citation omitted; emphasis supplied.) Id.

In this case, the language of the Agreement is clear and unambiguous. Despite Farid's arguments to the contrary, the Agreement provides that Knight "shall be fully released *under its policy* and under the Form MCS-90, and shall have no further obligation to [Farid] under either Policy Number AFXIN000038-00 or the Form MCS-90." (Emphasis supplied.) The Agreement further acknowledged that Knight "shall be fully released under the Form MCS-90, and *shall have no further obligation*

10

*to [Farid] under Policy Number AFXIN000038-00* or the Form MCS-90." (Emphasis supplied.) As a result, and as the trial court concluded, whether Knight's payment was made pursuant to an MSC-90 endorsement is not relevant because the Agreement released Knight under *both* the policy and the MCS-90 endorsement. Therefore, this argument fails.

(b) *Lack of Insurance for Tractor Trailer*. Next, Farid contends that Gaskell's tractor trailer was uninsured because the truck was not scheduled on EBMA's liability policy and because Gaskell had been fired at the time of the collision and was disobeying EBMA's instructions not to drive the truck. As we have already noted, these arguments are based, in whole, on *Farid's counsel's affidavit* reporting the purported circumstances underlying the Agreement. What is absent is any conclusive evidence in the record that Gaskell's truck was uninsured as that term is defined in OCGA § 33-7-11, and we are not authorized to make such a determination in this case.

Moreover, notwithstanding Farid's failure to demonstrate his entitlement to relief pursuant to OCGA § 33-7-11, Farid likewise failed to satisfy the exhaustion requirements of OCGA § 33-24-41.1 and is therefore precluded from asserting a claim against Mid-Century. OCGA § 33-24-41.1 (a) provides that

[i]n any instance where a claim arising out of a motor vehicle accident is covered by two or more insurance carriers, one such carrier may tender, and the claimant may accept, the limits of such policy; and, in the event of multiple claimants, the settling carrier may tender, and the claimants may accept, the limits of the policy pursuant to a written agreement between or among the claimants.

Pursuant to OCGA § 33-24-41.1, then, "[e]xhausting available liability coverage is a condition precedent to a UM claim." (Citation and punctuation omitted.) *Holland v. Cotton States Mut. Ins. Co.*, 285 Ga. App. 365, 366 (1) (646 SE2d 477) (2007). As a result, "[a] carrier must offer and a claimant must accept an amount equal to the limit stated in the policy, not an amount less than the limit stated in the policy." Id. Therefore, "[a] claimant may seek recovery under a UM policy when the claimant's damages exceed the limits of the tortfeasor's liability policy, after first recovering those liability limits from the tortfeasor through settlement." Id.

In this case, Farid resolved his claims with Knight for $450,000, well short of Knight's $1,000,000 policy limit.[8] In addition, the Agreement makes clear that Farid granted Knight a general release rather than a limited release. See *Rodgers v. St. Paul*

---

[8] We are mindful of Farid's apparent argument that OCGA § 33-24-41.1 does not apply because there was no coverage available and, therefore, there were no policy limits to exhaust. This argument fails because Farid failed to establish that Gaskell's truck was uninsured under OCGA § 33-7-11.

12

*Fire & Marine Ins. Co.*, 228 Ga. App. 499, 500 (1) (492 SE2d 268) (1997) (holding that when a general release in favor of an uninsured motorist is signed, "the uninsured motorist carrier was also released as a matter of law because of the derivative nature of the insurance company's liability") (citation and punctuation omitted). As a result, Farid failed to exhaust Knight's limits as required by OCGA § 33-24-41.1, which precludes any recovery from Mid-Century, his UM carrier. See *Holland*, 285 Ga. App. at 366-367 (1).

(c) *Voluntary Payment*. Finally, Farid contends that Knight's remittance constituted a mere voluntary payment "to avoid litigation expenses over the applicability of the [MCS-90] surety obligation" and that, as a result, there remained a lack of insurance coverage. However, Farid failed to support this argument with a single citation of authority, and it is therefore deemed abandoned. See Court of Appeals Rule 25 (c) (2) ("Any enumeration of error that is not supported in the brief by citation of authority or argument may be deemed abandoned."); *BB&T Ins. Svcs. v. Renno*, 361 Ga. App. 415, 427 (4) (864 SE2d 608) (2021).

In short, Gaskell's tractor trailer was either insured or uninsured. If Gaskell's truck was in fact uninsured, Farid has failed to demonstrate that it was uninsured; therefore, he cannot avail himself of the provisions of OCGA § 33-7-11. If Gaskell's truck was insured, the Agreement clearly and unambiguously released Knight from

13

its motor carrier liability policy and MCS-90 obligations for an amount less than Knight's $1,000,000 policy limit, meaning that the Agreement did not comply with the exhaustion requirements of OCGA § 33-24-41.1 before Farid sought additional payment from Mid-Century. Under either scenario, Mid-Century is entitled to judgment as a matter of law. Therefore, we affirm the trial court's order granting Mid-Century's motion for summary judgment.

*Judgment affirmed. Barnes, P. J., and Brown, J., concur.*